# Wistar's Appeal.

1. Settlements of family disputes are favorably regarded in law and equity, and are supported as beneficial in themselves, and as conducing to peace and harmony where it should most especially exist.

2. A bill for specific performance of such agreement is an appeal to the conscience of the chancellor, who exercises sound discretion under all the circumstances; he will not interfere if the bargain be hard or unconscionable, the terms unequal or the plaintiff taking undue advantage from the strict legal construction of the words.

3. Unless it be perfectly clear that the minds of the parties have been in accord on all material parts of the agreement, a chancellor will not interfere, but leave the parties to their legal remedies.

[Wistar's Appeal.]

4. In the compromise of family disputes, the agreement should be complete in itself, not a mere aim looking to future adjustment of details, and leaving it so that it may be a source of future litigation.

5. The agreement in this case not enforced as a family settlement.

February 2d 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the Court of Common Pleas of *Philadelphia:* In Equity: Of January Term 1874, No. 276.

On the 26th of October 1872, a bill was filed by Sarah W. Gillilan, Rachel L. Harvey and Fanny W. Scott, with their respective husbands, against Richard Wistar and William L. Wistar. The bill set out:—

1. The plaintiffs and defendants were the only children of Richard Wistar, deceased, and nephews and nieces of Sarah Wistar, who was their father's sister.

2. Sarah Wistar died September 21st 1866, unmarried, and, as plaintiffs alleged, intestate, leaving neither father, mother, sisters nor brothers, but leaving the plaintiffs and defendants, her only nephews and nieces, and owning a large real and personal estate.

3, 4. The defendants propounded a paper-writing as her will; it was admitted to probate by the register, October 3d 1876; an appeal was taken, and a feigned issue was awarded to try in the Common Pleas whether the paper was her will; this issue was pending.

5. Fourteen actions of ejectment had been brought in the Supreme Court to recover a number of pieces of real estate in Philadelphia, late the property of the decedent; these actions were pending.

6. After numerous efforts to settle this family dispute, an agreement was made by which the plaintiffs, "for the sake of peace, agreed to take, and the defendants to give, in full settlement and satisfaction of all interest and claim on their deceased aunt's estate, in addition to the devises and bequests of the will, $40,000 in down-town lots, to be appraised" by one person to be selected by the plaintiffs and one by the defendants; the plaintiffs selected William Loughlin, who accepted the appointment; the defendants selected Edward Bedlock, who declined to act; the defendants had since refused to appoint another appraiser, or pay the $40,000, or to be bound by the agreement. The agreement was by letters of the counsel of the respective parties, having full power in the premises; these were six letters, copies of which were annexed to the bill, and hereafter stated as Nos. 6, 7, 8, 9, 10, 11.

7, 8. The "down-town lots" were unimproved lots in Philadelphia, belonging to the estate of Sarah Wistar or the defendants; the $40,000 was to be paid to the plaintiffs in addition to what was given them by the will; in default of completing the part of

the agreement, as to the lots, the plaintiffs averred that they were entitled to $40,000 in cash.

9. Four of the actions of ejectment on the trial list had been continued in consequence of the agreement.

10, 11. The agreement was entered into " for the sake of peace," and the settlement of a family dispute; and the plaintiffs, on the payment of the $40,000, were ready to release all interest in the estate of Sarah Wistar, except their devises and legacies.

12. The defendants refused to perform their agreement, and insisted on trying the issue on the will in the Common Pleas.

The prayers were :—

That the rights of the parties might be ascertained and declared; that the defendants be decreed to appoint a referee in conjunction with the plaintiffs' referee, to appraise the lots, or in default, to pay the $40,000 ; that when the lots had been appraised the defendants convey them to the plaintiffs; that defendants continue the issue on the will until this case be disposed of, and for general relief.

The following are letters referred to in the bill, with others, in evidence in the case :—

No. 1.

3d October 1870.

My Dear Sir :—I sent up to your office to-day, between 11 and 12 o'clock, but you were not in.   Could you meet Mr. Morris and myself at one o'clock P. M., on Thursday, the 6th, at my office, to talk over the matter we spoke of to-day ?   Yours truly,

EDWARD WALN, Esq.                                    G. W. BIDDLE.

No. 2.

December 17th 1870.

Gentlemen :—I have succeeded in persuading the Messrs. Wistar to entertain the suggestion of $67,500 as a basis of compromise of the disputed estate of the late Miss Wistar.   The details, which a glance shows to be complicated, we will have to arrange by conference and negotiation.   I will thank you to apprise me, not later than Monday next, of your agreement that all legal proceedings be suspended during the negotiation, because Tuesday next will be *the latest* period for preparing the feigned issue for trial.                              I am, very truly,

E. WALN.

To P. P. MORRIS and GEO. W. BIDDLE, Esqs.

No. 3.

December 19th 1870.

E. WALN, Esq.

Dear Sir :—In reply to yours of the 17th instant, naming $67,500 as a basis of compromise in this matter, details to be arranged by conference and negotiation, we accept the proposition,

· [Wistar's Appeal.]

and we agree to your suggestion that all legal proceedings be suspended during the negotiation, which we trust will be entered upon at once, and brought to a conclusion at as early a day as practicable.·                              Yours very truly,

P. P. MORRIS,
GEO. W. BIDDLE.

### No. 4.

March 4th 1871.

Gentlemen :—I am authorized to close, by way of compromise, the unfortunate litigation in this estate on the following terms :—

First. Messrs. R. & W. L. Wistar to renounce the office of trustees ; the *cestui que trusts*, according to law, to have new ones appointed under the will.

Second. Sixty-seven thousand dollars to be given, in which are included the special devises and bequests to the ladies.

Third. The difference between the amount of aforesaid devises and bequests and sixty-seven thousand dollars to be taken by them in down-town real estate, which, if not enough by valuation, as agreed on in Article 4, the Messrs. Wistar to make up such deficiency in other property or in cash, at their option.

Fourth. I concede, which is to your benefit, that in estimating the property included in Article 3, the assessment of 1870 shall be the binding basis.

Fifth. All taxes, including and in addition to the succession and collateral inheritance taxes on the devises and bequests to the ladies in trust, and also on the properties or cash, to make up the difference to sixty-seven thousand dollars, shall be ·deducted from the amount before settlement.

Sixth. The feigned issue to be withdrawn, the ejectments to be *non prossed*, and each party to pay their own costs.

I am, very truly, &c.,

ED. WALN, Attorney for R. WISTAR and W. L. WISTAR.
To P. P. MORRIS, GEO. W. BIDDLE, Esqrs.

### No. 5.

No. 721 Walnut street, April 5th 1871.

Gentlemen :—I regret to be obliged to inform you that your propositions of settlement in Sarah Wistar's estate are declined, and all the inducements I offered to you are withdrawn.

I am, very truly, &c.,

E. WALN, for R. and W. L. WISTAR.
To P. P. MORRIS, G. W. BIDDLE, Esqrs.

### No. 6.

December 22d 1871.

Gentlemen :—I make a final proposal, so that, if rejected, we may try the feigned and other issues. The Messrs. Wistar will pay in full settlement and satisfaction of all interest and claim

[Wistar's Appeal.]

of the ladies on their deceased aunt's estate, $40,000, in down-town lots, to be appraised by two persons, one selected by the ladies and one by the gentlemen, which two may select a third in case of disagreement. * * *

ED. WALN, for R. & W. L. WISTAR.

To P. P. MORRIS, Esq., GEO. W. BIDDLE, Esq.

### No. 7.

December 26th 1871.

E. WALN, Esq.

Dear Sir :—Your note of 22d inst., making, as you say, a final proposal in this matter, is susceptible of more than one interpretation. If it means to offer $40,000 in down-town lots, the ladies retaining the devises and bequests contained in their aunt's will, we accept it for the sake of peace. If it means that they are to take $40,000 in down-town lots and relinquish the legacies as well as the contestation, we reject it unhesitatingly. If we do not agree we shall expect to try the cases on the list next week.

We are very respectfully yours,

G. W. BIDDLE,
P. P. MORRIS.

### No. 8.

January 1st 1872.

My Dear Gentlemen :—I have had my witnesses notified to attend to-morrow in Scott v. Wistar, but on calling to-day I find Mr. R. Wistar too ill to attend or to undergo the excitement of a trial. * * * Under these circumstances, I have obtained authority, which I do, to accept your offer as conveyed in your last joint note, " for the sake of peace," viz. : the legacies and $40,000 to be settled for or agreed on. * * *

Very truly your friend and obedient servant,

EDWARD WALN, for R. & W. L. WISTAR.

To P. P. MORRIS Esq., GEO. W. BIDDLE, Esq.

### No. 9.

Philadelphia, January 1st 1872.

Dear Sir :—We are just in receipt of your note of this date agreeing to the terms of compromise as expressed by us in our letter of 26th December 1871, for which accept our thanks. This will relieve the parties and witnesses from any attendance in court to-morrow. Will you kindly give us the name of your appraiser at your early convenience?          Very truly yours,

GEO. W. BIDDLE,

To EDWARD WALN, Esq.          P. P. MORRIS.

### No. 10.

January 2d 1872.

Gentlemen :—In compliance with your request, I am directed to

[Wistar's Appeal.]

name Mr. Edward Bedlock, real estate conveyancer, as the appraiser exp. R. and W. L. Wistar.　　　I am very truly yours,

E. WALN.

To P. P. MORRIS, Esq., G. W. BIDDLE, Esq.

## No. 11.

January 3d 1872.

E. WALN, Esq.

Dear Sir :—Your favor of yesterday, naming Mr. Edward Bedlock as the appraiser of the part of Messrs. R. and W. L. Wistar, is received.　On the part of the ladies, we name Mr. William Loughlin, one of the Board of Revision of Taxes.

Yours truly,

P. P. MORRIS,

G. W. BIDDLE.

## No. 12.

Philadelphia, February 3d 1872.

Dear Sir :—We have not heard from you since last Saturday when we named our proposition.　You were to let us hear from you at the beginning of the week.　Time is rolling by and we do not advance.　Pray oblige us by a very early answer.　We will be in the Nisi Prius court to-morrow.　　　Yours truly,

G. W. BIDDLE.

EDWARD WALN, Esq.　　　P. P. MORRIS.

The defendants admitted the first five paragraphs of the bill; they averred that to avoid further family scandal growing out of the litigation, negotiations for a settlement were entered into ; they set out many difficulties which prevented bringing the negotiation to a close; one of which was the filing of their account by the defendants of income collected by them on the devises and bequests to the plaintiffs, who desired to receive a "round sum;" this point of filing the accounts was waived by the defendants and the negotiation was resumed ; the plaintiffs, after demanding $60,000, fell to $40,000 at this point, and to include in it the accretions so as to avoid the delay of auditing, &c., the letter of January 1st 1872, was written and the words "to be settled for as agreed on," had reference to what had been insisted on by plaintiffs, the round sum should include the accretions and that it should be received as payment in full.　As soon as defendants heard that plaintiffs put a different construction on the correspondence and before anything had occurred to change their rights or prejudice them, they wrote to the plaintiffs, on the 17th of January 1872, that it was not intended that the words " devises and bequests " in the letters, should carry the rents and interest.

The plaintiffs thereupon abandoned the compromise and proceeded to make preparations for the trial of the ejectments.

There were other matters set out in the answer not important, in view of the opinion of the Supreme Court, to state.

Miss Wistar, by her will, besides the gift of a few legacies to friends and servants and some chattels to her nephews and nieces, gave each of her nephews a large amount of ground-rents and other real estate, each part of these devises being specifically designated; also certain securities, &c.

She gave to her nephews and two others a number of ground-rents, which she described particularly, and some bank stock, to hold in trust for her niece, Sarah W. Hopkinson, afterwards Sarah W. Gillilan, for her separate use during life, and at her death to be divided as was directed in the will.

She gave to the same persons other ground-rents, also described specifically, and bank stock, &c., to hold in trust for her niece, Rachel L. Wistar, afterwards Harvey, in the same way as in the former trust.

She gave to the same persons other ground-rents similarly described and bank stock, &c., to hold in trust in the same way for her niece Frances A. Scott.

She gave the residue of her estate to her two nephews and appointed them the executors.

According to the appraisement by the collateral appraiser, the value of the devises and bequests was as follows:—

| | | | | | |
|---|---|---|---|---|---|
| Sarah Gillilan, | . | . | . | . | $7,756.57 |
| Rachel L. Harvey, | . | . | . | . | 7,791.86 |
| Frances A. Scott, . | . | . | . | . | 6,788.03 |
| William L. Wistar, | . | . | . | . | 86,357.88 |
| Richard Wistar, | . | . | . | . | 107,202.33 |

A replication was filed, and Edward Law, Esq., appointed examiner and master.

The master reported:— * * *

" Pending the trial of the feigned issue, and actions of ejectment, several endeavors were made to compromise this family dispute, the first of which, that took any definite form, naming $67,500 as a basis of settlement, the details to be arranged afterwards by conference and negotiation. The correspondence in regard to this arrangement was conducted by the counsel for either side respectively, and is contained at length in letters of October 3d 1870, and January 2d, and February 3d, 1871, printed in the answer; and December 17th and 19th, and March 4th and April 5th 1871." Owing to some disagreement, in regard to what it does not definitely and clearly appear, Mr. Waln, counsel for the defendants, in his letter of April 5th 1871, abruptly and peremptorily broke off all negotiations and declared them at an end."

He reported also that the letters of December 22d 1871 (No. 6), December 26th 1871 (No. 7), January 1st 1872 (No. 8 & 9), con-

tained the agreement which the plaintiffs relied on to compel specific performance.

Mr. Loughlin was appointed appraiser by the plaintiffs and Mr. Bedlock by the defendants.

Bedlock declined, because the correspondence had so much ambiguity about it, and he had been on amicable terms with all the parties, and because Mr. Loughlin, from his official position, must have formed his opinion. The counsel of the plaintiffs requested Mr. Waln, the counsel of defendants, to select another person, which was not done. Mr. Waln deprecated a legal construction, that " devises and bequests," carried rents and interest, saying such was not the meaning which in an amicable compromise like this, those words should bear ; the other counsel insisted upon adhering to the legal interpretation of the agreement. Some further negotiation looking to settlement was had, but no settlement was made.

The master proceeded :—

" It therefore becomes proper to examine the nature and effect of the agreement upon which the complainants rely in their bill to enforce specific performance.

" That it is an agreement for the purpose of settling a family dispute has been fully proved ; that it is moreover an agreement in writing whose terms are clear, certain, and final, without allusion to any prior negotiation or attempted settlement, and without reference to further conference or adjustment, save the appraisement of the down-town lots, ' as agreed upon,' a simple inspection of the letters which constitute it, will establish beyond question. By virtue of it, the complainants agree to abandon the trial of the feigned issue and suits in ejectment, and in consideration of their relinquishing these actions the defendants on their part agree to pay the sum of $40,000 in down-town lots ; and in addition thereto, the legacies and devises left them by their aunt's will.

" The terms ' bequests and devises,' legally and in the eyes of a court of equity, carry with them, as to the latter, the rents accruing from the time of Miss Wistar's death ; and as to the former, the interest arising since a period one year distant from that event.

" Now, although indisputably prior efforts towards a compromise were made, and letters having that object in view passed between the counsel on either side, it cannot with justice be contended that there exists such a connection between the former abortive attempts at a settlement, and the final agreement as will constitute the former part of the latter.

" The letter of Mr. Waln, of April 5th 1871, raises up an impassable barrier between the two transactions, and as strongly as is within the power of language, separates them ; he there peremptorily and abruptly, without assigning any reason whatsoever,

declines all propositions of settlement, and declares that all induce-
ments offered by him are withdrawn.

"Any effort to unite them in one transaction must therefore
fail, and we may proceed at once to the consideration of the argu-
ment urged by the defendants, that the agreement in question was
entered into through mistake, and was the result of mutual sur-
prise; that the former attempt at settlement was broken off owing
to the fixed desire of the complainants to obtain over and above the
$67,500 named therein as a basis of compromise, the rents and
interests arising upon the devises and legacies; and finally that
the words 'bequests and devises,' as used by the counsel for the
complainants in their letter of December 26th 1871, and acceded to
by Mr. Waln, in his of January 1st 1872, were not intended, by
either party to the compromise, to bear the strict legal interpreta-
tion which a court of law would accord them.

"It will be necessary perhaps to answer these objections some-
what at length.

"The mistake and surprise, if any existed, were certainly uni-
lateral, and not mutual; there is not the shadow of a reason for
the supposition that the complainants on their part did not know-
ingly and with a full understanding of the legal import of the words
used by them, consummate the agreement; nor is there anything
whatever to indicate that they were in any way conscious of a mis-
take or misapprehension on the part of the defendants.

"Granting, then, for the sake of argument, that the defendants
labored under the erroneous impression that in this amicable set-
tlement, by a sort of tacit agreement the legal significance of the
words was for the time being waived, would such a misconception,
in equity, relieve them from the consequences of their act?

"The master is of the opinion that a misconception, such as is
claimed by the defendants, is, even if clearly shown, insufficient to
overthrow an agreement for the settlement of a family dispute.
But it must be held in mind that, to set aside a written contract
upon the ground of mistake, the mistake must either be admitted
in the bill or answer, appear from the nature of the case, or else be
clearly and satisfactorily proved; neither of which three things is
the case here. The sole evidence which goes to establish mistake
on the part of the defendants, is the testimony of Mr. Richard
Wistar, who not only declares that a former negotiation was ter-
minated, owing to a disagreement in regard to the inclusion or
exclusion of the rents and interests arising from the legacies and
devises, but testifies that the principal agreement in question was
entered into upon the understanding that they were to be included
in the $40,000 named therein.

"Now, apart from the extreme danger of allowing an inter-
ested party, by means of his sole and unsupported testimony, to
provoke mistake, and so free himself from the deliberate obliga-

tions imposed upon him by means of a written contract, the evidence of Mr. Wistar is, in the master's opinion, contradicted by the presumptions arising from the facts of the case.

"If the former negotiation referred to by him is the attempted settlement so abruptly terminated by Mr. Waln's letter of April 5th 1871, and it was broken off, as he declares, owing to a desire on the part of the complainants not to include the rents and interest arising from the legacies and devises in the $67,500 named therein as a basis of compromise, what is the conclusion to be derived from such a state of facts?

"Would the defendants, acting subject to the advice of counsel of great experience, and who must be supposed to have rendered them fully cognisant of the legal meaning of the terms used, and forewarned by their former experience of the demands of the complainants, have carelessly and hastily acceded to a contract which, by its language, accomplished the very object which they were so anxious to avoid? On the contrary, would they not naturally have been most careful to provide against anything like mistake by insisting upon the use of the words and phrases which would legally secure them from future misapprehension and annoyance? By the terms of the former abortive attempt at settlement, had it been consummated, the complainants could have obtained nothing more than $67,500. Why then an alteration in the meaning of the final agreements, if it were not that the defendants had undergone a change of purpose, and had at length determined to accede to the complainants' demands? This inference is certainly unavoidable in view of the fact that it was the former and not the latter, who, as the time for the trial of the feigned issue approached, reopened, first, the matter of amicable settlement and tendered an offer of compromise. * * *

"The clause in regard to the appointment of appraisers is not an arbitration or reference, but merely an agreement for the appraisement of land. What then might have been the effect of Mr. Bedlock's refusal to act, had he, in conjunction with one or more persons, been originally, by name, selected as an appraiser, it is useless to discuss; as the matter stands it is incumbent upon the defendants, in pursuance of their agreement, to name some one who will consent to act, or failing that, to pay the $40,000 in cash." * * *

The master reported that the complainants were entitled to a decree in their favor, viz. :—

1. That the agreement reported by the master, as proved, be established, and ordered to be carried into execution.

2. That the defendants, within thirty days, appoint a referee to appraise the lots, in conjunction with the appraiser appointed by the plaintiffs, and in default of appraisement within sixty days, unless the default be occasioned by the neglect of plaintiffs' referee to

act, that the defendants pay to the plaintiffs $40,000, the plaintiffs releasing all claims against the estate of Sarah Wistar, except their interests under her will.

3. When lots to the amount of $40,000 shall have been appraised, the defendants to be ordered to convey them to the plaintiffs, as tenants-in-common, the plaintiffs to release as above.

The defendants excepted to the report of the master.

The Court of Common Pleas, Peirce, J., overruled the exceptions, confirmed the report, and made the decree recommended by the master.

The defendants appealed to the Supreme Court, and in a number of specifications assigned the confirmation of the report and the decree of the court below for error.

*N. H. Sharpless* and *E. Waln*, for appellants.—The only consideration for the agreement was the restoration of family peace; there was a manifest misunderstanding between the parties as to its meaning ; and if the legal construction be as the plaintiffs contended, it was a mistake, and that ground is a defence to specific performance : Snell's Equity 440 ; Fry on Specific Performance 212. Specific performance will not be enforced in favor of a feme sole, because it could not be enforced against her : Bispham's Equity 348, 349. To enforce specific execution the terms must be clear : Walpole *v.* Oreford, 3 Vesey 402 ; Snell's Equity 425 ; Lumly *v.* Wagner, 1 De Gex, M. & G. 604.

*P. P. Morris* and *G. W. Biddle*, for appellees.—Although no money was paid, and although there was no seal to import a consideration, and although the contract was in part executory, equity, in view of the relations of the litigants to each other, and the character of their controversy, declares such an agreement binding, and one which a chancellor will enforce : Williams *v.* Williams, 2 Drewry & Smale, 378 ; s. c. Law Rep. 2 Chanc. Cases 294. In cases of family arrangements the court gives great weight to considerations which would not be taken into account in ordinary contracts : Stapilton *v.* Stapilton, 1 Atkyns 2 ; Stockley *v.* Stockley, 1 Ves. & B. 31 ; Cory *v.* Cory, 1 Ves. Sen. 19 ; Shartel's Appeal, 14 P. F. Smith 25 ; Lies *v.* Stub, 6 Watts 52 ; Barton *v.* Wells, 5 Whart. 227. The termination of a family controversy is a benefit in which all the family share, and therefore a sufficient consideration for the agreement : Bailey *v.* Wilson, 1 Dev. & Bat. 182 ; Woolfolk *v.* Woolfolk, 4 Dana 435 ; Naylor *v.* Winch, 1 J. & J. 564. The compromise of a doubtful right is a good consideration : Cann *v.* Cann, 1 P. Wms. 723 ; Barlow *v.* Ocean Ins. Co., 4 Metc. 270 ; Cook *v.* Wright, 1 B. & S. 550 (101 E. C. L. R. 559) ; Gallager *v.* Bishoppsheim, Law Rep. 5 Q. B. 5, 449 ;

[Wistar's Appeal.]

Perkins *v.* Gay, 3 S. & R. 332 ; O'Keson *v.* Barclay, 2 Penna. R. 531 ; Brown *v.* Sloan, 6 Watts 421 ; Rice *v.* Bixler, 1 W. & S. 445 ; Masson's Appeal, 20 P. F. Smith 26.

When specific performance ought to have been, and would have been, decreed upon the state of facts existing when the bill was filed, but cannot be decreed upon a hearing of the cause, because the defendant, pending the suit, has voluntarily disabled himself to make a conveyance, the court will not permit itself to be ousted by fraud or contrivance of a jurisdiction rightfully and legally acquired, but will proceed against him who thus attempts to injure another and impose upon the court; and will, by the assessment of damages, compel him to make compensation for the injury : Woodman *v.* Freeman, 25 Maine 531 ; Phillips *v.* Thomas, 1 Johns. Ch. 131 ; Hatch *v.* Cobb, 4 Id. 559 ; May *v.* LeClaire, 11 Wall. 236.

Mr. Justice SHARSWOOD delivered the opinion of the court, May 8th 1876.

It is certainly true that all agreements for the compromise and settlement of family disputes are favorably regarded, both in courts of law and equity, and are supported, not only as beneficial in themselves, but as conducing to peace and harmony, where it ought most especially to exist : Shartel's Appeal, 14 P. F. Smith 25. And in one case such an agreement was upheld, even where there had been a misconception of his legal rights by one of the parties : Lies *v.* Stub, 6 Watts 52. But the principle is not to be carried so far as to work practical injustice. Especially it ought not to override every other rule upon which courts of equity proceed in the enforcement of the specific performance of contracts. A bill for that purpose is always an appeal to the conscience of the chancellor, in which he exercises a sound discretion under all the circumstances, and he will not interfere if the bargain is hard or unconscionable, or the terms unequal, or the complainant is taking an undue advantage from the strict legal construction of the words : Oil Creek Railroad *v.* Atlantic and Great Western Railroad, 7 P. F. Smith 65. Even at law it may be stated as a sound principle of determination, that if the reasonable interpretation of an alleged offer and acceptance shows that something material as between the contracting parties is left to be afterwards arranged, the mind of the defendant never assented to all the terms proposed, never was at one with the mind of the plaintiff, there would be no agreement between him and the plaintiff, for breach of which an action would be maintainable. *A fortiori*, in a court of equity, unless it is perfectly clear that the minds of the parties have come together and been in accord upon all the material terms of the agreement, a chancellor ought to decline to interfere, but leave the parties to their legal remedies. In the com-

promise of family disputes particularly, the agreement of compromise should be complete in itself, not a mere plan looking to a future adjustment of details; more especially when, so far from settling the family difficulties, it will be itself merely the germ of future litigation. Otherwise, instead of promoting peace and harmony, it may be the source of prolonged discord and dissension.

We are of opinion that the correspondence, upon which the alleged compromise in this case rests, does not show clearly that the minds of the parties were at any time at one, and that specific performance ought not, therefore, to be decreed. A very important matter of dispute, whether the bequests and devises in the will of Sarah Wistar, which was in contest, in favor of the complainants, should carry with them the accretions from the date of the will, was a point not mentioned. Upon a strict legal construction of the words of the offer and acceptance, they would follow. It is not an insignificant fact that in a former unsuccessful attempt to compromise this family controversy, they had split upon this very question of an account of these accretions. Had it been in the minds of both parties when these letters passed, it certainly would have been mentioned or attended to. If it was in the minds of the complainants they should have expressed it, and not to have left it to a mere legal inference, that the devises and bequests would of themselves carry their accretions. But this is not all. It is very clear that when Mr. Waln introduced the subject of a compromise in his note of December 22d 1871, he meant the arrangement to be a complete and final one. "The Messrs. Wistar will pay in full settlement and satisfaction of all interest and claim of the legatees in their deceased aunt's estate, $40,000, in downtown lots." The whole controversy was to be settled by a round sum in down-town lots, according to an appraisement by persons eventually to be chosen, and that was to be the end of it. When the counsel of the complainants proposed to vary his offer by the addition of the devises and bequests contained in their aunt's will, Mr. Waln had no reason to suppose that the main purpose in view —an immediate and final settlement, which would at once put an end to all litigation and produce family peace—was thereby to be abandoned. The legacies and devises to the complainants, or to the defendants in trust for them, were all specific. There was no element of uncertainty and dispute introduced thereby into the arrangement. But when they go further and claim all the accretions upon these devises and bequests since the death of the testatrix—subject to all just allowances to the trustees—and without any provision as to the manner in which the amount which would be coming to the complainants, was to be ascertained and settled, it is evident that here is a matter of account extending over a period of five years, and without some new agreement, only to be reached by adverse proceedings. The defendants then as trustees

would remain liable to account.    It is not easy to regard this as a full settlement of all interest and claims of the complainants, such as was contemplated by Mr. Waln's proposition of December 22d 1871.

This was not then the case of a mere misconception of their legal rights by the defendants.    It was a failure of the whole purpose of the compromise, which was to be a full, final and immediate settlement of all matters of controversy, so that domestic peace and harmony might be at once and for ever restored between these near relations.    Under all the circumstances we think that it would not be equitable to enforce the specific performance of this alleged agreement of compromise.

> Decree reversed and the bill dismissed, each party to pay their own costs in this court and in the court below.